## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEVIN BROWN | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:08-CV-1923 (JCH) |
| v. | : | |
| | : | |
| CITY OF WATERBURY BOARD | : | |
| OF EDUCATION, ET AL. | : | JUNE 28, 2010 |
| Defendants. | : | |

### RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 31)

**I.    INTRODUCTION**

Kevin Brown ("Brown"), the plaintiff in this case, is a former maintenance employee of the City of Waterbury Board of Education ("Board of Education").  On December 18, 2008, Brown initiated this federal action against both the Board of Education and Ron Frost ("Frost"), the Board of Education's Director of Personnel (collectively, "the defendants").  Brown's Complaint contains three counts. Count One alleges discrimination, in violation of Conn. Gen. Stat. § 46a-60(a)(1).[1]  Count Two alleges discrimination, in violation of the Americans with Disabilities Act.  Count Three alleges a violation of 42 U.S.C. § 1983, for unlawful retaliation in violation of the First Amendment to the United States Constitution.  On February 26, 2010, the defendants moved the court for summary judgment.  For the reasons stated herein, that Motion is granted in part and denied in part.

---

[1] While the Complaint states several times that Count One alleges a violation of "Conn. Gen. Stat. § 46a-60(1)," there is no such statutory provision.  Paragraph 13 of the Complaint makes clear, however, that Count One in fact alleges a violation of  Conn. Gen. Stat. § 46a-60(a)(1).

1

## II.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' " Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

2

III.     **FACTUAL BACKGROUND**

A.     <u>Brown's Employment History and Injuries</u>

Brown began his employment with the Board of Education in September of 1993,

in the position of Custodian I.  L.R. 56(a)(1) at ¶ 1.  In 2001, he was promoted to the

position of Custodian II.  <u>Id</u>. at ¶ 2.  Brown had shoulder surgery in both 2000 and 2003,

as a result of workplace injuries, and on December 29, 2003, the Board received a

letter from his physician, Dr. Richard Matza, indicating that he should be restricted from

performing "heavy custodial work."  <u>Id</u>. at ¶¶ 3, 4. The Board received another letter

from Dr. Matza in November of 2004, which stated that Brown's work should "include no

repetitive use of his arms above shoulder level, no lifting of weight greater than 10

pounds, and no climbing."  <u>Id</u>. at ¶ 5.  Despite these restrictions, Brown continued to

work on a full-time basis, until December 23, 2005, on which date he suffered a back

injury while attempting to pull a "barrel of trash," weighing between 75 and 150 pounds,

"up a little flight of stairs."  <u>Id</u>. at ¶¶ 6, 7, 9.  Following his back injury, Brown was out of

work until December 7, 2006.

On August 16, 2006, Frost sent a letter to Brown, stating that "information has

been received that indicates Mr. Brown is unable to perform the essential functions of

his position . . . ."  <u>Id</u>. at ¶¶ 11, 12.  The letter stated that a meeting would be held to

discuss Brown's employment future with the Board of Education, at which Brown would

be able to have union representation present.  <u>Id</u>. at ¶ 12.  A meeting was held on

August 25, 2006, at which Brown's inability to perform the "essential functions" of his

position was discussed.[2]  Another letter was sent to Brown on December 1, 2006, by

School Inspector Herb Greengas.  L.R. 56(a)(1) at ¶ 17.  This letter, among other

things, stated that a meeting had been scheduled for December 5, 2006, and notified

Brown that the meeting might result in his separation from employment.  Id. at ¶ 18.  At

the December 5 meeting, Board of Education officials discussed with Brown his

continued ability to serve as a custodian, due to his back injury, shoulder injuries, and

Dr. Matza's letters.  Id. at ¶ 20; L.R. 56(a)(2) at ¶ 20.[3]  Two days later, Greengas sent

Brown another letter, stating that he was medically separated from his employment with

the Board of Education as of December 7, 2006.  L.R. 56(a)(1) at ¶ 24.

Brown thereafter contacted his union, which filed a grievance on his behalf,

alleging that the termination of Brown's employment was in violation of the applicable

collective bargaining agreement.  Id. at ¶ 29, 30.  While a hearing was held before the

Connecticut State Board of Mediation and Arbitration, the grievance was ultimately

denied.  Id. at ¶ 30, 31.

    B.    The 2005 Lawsuit

On July 1, 2002, Brown was arrested on allegations that he had stored

"excessive amounts of petroleum products" at Westside Middle School, which is located

---

    [2] Brown apparently denies that such a meeting ever occurred.  See L.R. 56(a)(2) at ¶ 14.  The evidence Brown cites, however, indicates that there were two meetings after the December 7, 2006 mail notification and then refers to "the first meeting" that was held after Brown "was notified by mail on or about December 7, 2006, that [he] was going to be terminated." See Affidavit of Kevin Brown at ¶¶ 13, 15.  The fact that two meetings were held after December 7, 2006, does not lead to the conclusion that no meetings were held before that date.

    [3] While Brown denies this allegation, the court is confused as to what aspects of L.R. 56(a)(1) ¶ 20 he is denying.  See L.R. 56(a)(2) at ¶ 20.  Brown does not deny that his shoulder injuries "may have been discussed" at the meeting.  Id.  He also states that a discussion took place on the possibility of his doctors releasing him to work.  He cites paragraph 17 of his Affidavit, which discusses events that transpired on April 2, 2007, and apparently does not relate to the meeting in December 2006.

in Waterbury, Connecticut.  Id. at ¶ 53, 54.  The criminal charges against Brown--one

count of reckless endangerment in the first degree and four counts of regulatory

violations related to flammable or dangerous liquids, id. at ¶ 52--were dismissed in

January 2004.  Id. at ¶ 54.  On April 12, 2005, Brown filed a federal civil rights complaint

arising out of his criminal case, alleging that his constitutional rights were violated when

he was subject to false arrest and malicious prosecution (hereinafter "the 2005

lawsuit").  Id. at ¶ 55.  The defendants in the 2005 lawsuit were two fire marshals for the

City of Waterbury, Carmen Mallamaci and Daniel Aybar.  Id. at ¶ 50. The lawsuit

ultimately proceeded to trial, after which, on November 21, 2006, the jury rendered a

verdict in the defendants' favor.  Id. at ¶ 56.

## IV.   DISCUSSION

### A.   Americans With Disabilities Act[4]

Brown claims that the termination of his employment with the Board of Education

constituted a violation of the Americans with Disabilities Act ("ADA"), a federal statute

that provides, inter alia, that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment."  See 42 U.S.C. § 12112(a).

"Claims alleging disability discrimination in violation of the ADA are subject to the

burden-shifting analysis originally established by the Supreme Court in McDonnell

---

[4] The court addresses Brown's ADA claim before addressing his claim under state law, even
though the state law claim is contained in Count One of the Complaint.  Brown's state law claim alleges a
violation of a Connecticut statute, analysis of which borrows from ADA precedent.

5

Douglas Corp. v. Green, 411 U.S. 792 (1973)."  McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 96 (2d Cir. 2009).  Under such a burden-shifting analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006).

The defendants argue that summary judgment must be granted on Count Two because Brown cannot establish a prima facie case under 42 U.S.C. § 12112(a).  To establish such a case, Brown must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir.2001).  It is undisputed that Brown's employer is subject to the ADA, and that Brown suffered an adverse employment action.  However, the defendants maintain that Brown has not raised a genuine issue of material fact as to whether he was disabled within the meaning of the ADA and whether he was otherwise qualified to perform the essential functions of his job.  See Memorandum in Support of Motion for Summary Judgment ("Mem. in Supp.") at 4.

      1.    Whether Brown was Disabled Under the ADA

The ADA defines "disability" as either:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

6

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

See 42 U.S.C. § 12102(1).  The defendants' Memorandum in Support of the Motion for

Summary Judgment devotes considerable energy to an argument that Brown was not

actually impaired in any way that substantially limited his major life activities.  For

example, the defendants state that, "Mr. Brown's claims that he is disabled is [sic]

directly contradicted by his own testimony that the impairment never stopped him from

doing his job."  Mem. in Supp. at 11.  Brown, however, appears to concede the fact that

he was never actually impaired, for purposes of his ADA claim, because his ADA claim

is premised solely on the basis that the defendants regarded him as having an

impairment. Memorandum in Opposition to Motion for Summary Judgment at 7 ("Mem.

in Opp.").  "An individual meets the requirement of 'being regarded as having such an

impairment' if the individual establishes that he or she has been subjected to an action

prohibited under this chapter because of an actual or perceived physical or mental

impairment whether or not the impairment limits or is perceived to limit a major life

activity."  42 U.S.C. § 12102(3)(A).

The Supreme Court has explained that there are two ways in which an individual

may be "regarded as having a disability":

> (1) a covered entity mistakenly believes that a person has a physical impairment
> that substantially limits one or more major life activities, or (2) a covered entity
> mistakenly believes that an actual, nonlimiting impairment substantially limits one
> or more major life activities.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).  Brown's allegations appear

to fall within the second category.  Brown alleges that the defendants mistakenly

believed that his injuries substantially limited his ability to work, when in fact such injuries caused no such limitation.

To prevail on his claim, Brown must show not only "that the defendants regarded him as disabled, but that they regarded him as disabled within the meaning of the ADA." Giordano, 274 F.3d at 748 (internal quotation marks and citations omitted, emphasis removed). The question for the court, therefore, is whether the "impairment" from which the defendants allegedly perceived Brown as suffering constitutes "a physical or mental impairment that substantially limits one or more major life activities of [Brown]." Whether Brown's employer regarded him as disabled turns on "the employer's perception of [Brown]," which is "a question of intent," rather than a question of whether Brown is in fact disabled. Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997).

The court's analysis proceeds using the "three-step approach taken by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624 (1998)." Weixel v. Board of Educ. of City of New York, 287 F.3d 138, 147 (2d Cir. 2002). Under this approach, the court considers first "whether plaintiff suffered from a physical or mental impairment;" second, "whether the life activity upon which the plaintiff relied constitutes a major life activity under the ADA;" and third, "whether the plaintiff's impairment substantially limited the major life activity identified." Jacques v. DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2001). In this case, there is no dispute that the defendants regarded Brown as suffering from various physical impairments. Moreover, by the very terms of the statute, "working" constitutes a "major life activity." See 42 U.S.C. § 12102(2)(A). The defendants claim, however, that Brown's perceived impairment would not have

8

"substantially limited" his ability to "work."  The court agrees.

"[W]ith respect to the major life activity of working, the term 'substantially limits' means 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.' " Bartlett v. New York State Bd. of Law Examiners, 226 F.3d 69, 82 (2d Cir. 2000) (citing 29 C.F.R. § 1630.2(j)(3)).  Indeed, the regulations enacted pursuant to the ADA indicate that "the inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working." Colwell v. Suffolk County Police Dept., 158 F.3d 635, 643 (2d Cir. 1998) (citing 29 C.F.R. § 1630.2(j)(3)).  The court must therefore consider whether the defendants perceived Brown as restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

In attempting to establish that the defendants perceived him as substantially limited in his ability to "work," Brown has presented evidence that the defendants perceived him, correctly or incorrectly, as unable to perform various tasks that he would be required to perform as a maintenance worker, due to physical injuries.  Brown has presented evidence that the defendants perceived him as unable to perform "heavy custodial work," see, e.g., Doctor's Note Dated December 29, 2003; Memorandum from Herb Greengas to Peter Abare-Brown, Dated February 11, 2004, to engage in "repetitive use of his arms above shoulder level," to lift items greater than ten pounds, and to engage in climbing. See Doctor's Note Dated November 10, 2004.  Brown has also presented a letter from his doctor, dated after his termination, stating that he would

9

be unable to lift weight of more than twenty pounds, apparently due to his back injury. See Doctor's Note Dated April 2, 2007.

As a matter of law, such restrictions on a person's ability to do his job would not be sufficient to show a "substantial limitation" on an employee's ability to "work," within the meaning of the ADA jurisprudence.  In Colwell, the Second Circuit held that an individual police officer was not "substantially limited" when he was able to lift "light objects," but not "very heavy objects."  158 F.3d at 644.  Along these lines, multiple district courts within the Second Circuit have held that "the inability to lift in excess of ten pounds . . . , as compared to the abilities of the average person in the population, [is] not [a] substantial limitation[] on major life activities within the meaning of the ADA. Glozman v. Retail, Wholesale & Chain Store Food Employees Union, Local 338, 204 F. Supp. 2d 615, 621 (S.D.N.Y. 2002); see also Zarzycki v. United Technologies Corp., 30 F. Supp.2d 283, 289 (D. Conn.1998) (citing Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir.1996) (granting summary judgment in an employer's favor in a case involving an employee who was given a five to ten pound lifting restriction after hip and shoulder surgery).  As to Brown's perceived restrictions on "climbing," the court agrees that "climbing stairs and ladders . . . are not sufficiently significant or essential functions to qualify as major life activities under the ADA."  Piascyk v. City of New Haven, 64 F. Supp. 2d 19, 26 (D. Conn. 1999); but see Sussle v. Sirina Protection Systems Corp., 269 F. Supp. 2d 285, 299 (S.D.N.Y.2003) ("The Court finds that climbing stairs qualifies as a 'major life activity.'").  Finally, Brown's perceived inability to use his arms repetitively above his shoulders is not a substantial limitation, as the Supreme Court has held that "repetitive work with hands and arms extended at or above shoulder

10

levels for extended periods of time . . . is not an important part of most people's daily lives." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 201 (2002).[5]

The Second Circuit has stated that satisfying the ADA's statutory definition of a disability constitutes a "significant threshold for seeking redress under the ADA." Felix v. New York City Transit Authority, 324 F.3d 102, 107 (2d Cir. 2003). In this case, Brown cannot establish that the defendants perceived him as "disabled" within the meaning of the ADA, because he has presented no evidence that the defendants perceived him as suffering from impairments that would "substantially limit" his ability to "work." On this basis, the court grants the Motion for Summary Judgment as to Count Two of the Complaint.

> 2.      Whether Brown was "Otherwise Qualified"

Because the court has concluded that Brown cannot establish that the defendants perceived him as "disabled" within the meaning of the ADA, the court will not address the question of whether Brown was "otherwise qualified to perform the essential functions of his job."

> B.      Conn. Gen. Stat. § 46a-60(a)(1)

In relevant part, Conn. Gen. Stat. § 46a-60(a)(1), which is part of the Connecticut Fair Employment Practices Act (CFEPA), states that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . except in the case of a bona fide occupational qualification or need, to . . . discharge from

---

[5] Toyota Motor Mfg., as well as Sutton, cited above, were expressly overruled by Congress in the 2008 amendments to the ADA. However, the 2008 amendments, which took effect January 1, 2009, do not apply retroactively. The court therefore evaluates the present case pursuant to the law that was applicable at the time the defendants allegedly violated Brown's rights under the ADA. See, e.g., E.E.O.C. v. Agro Distr. LLC, 555 F.3d 462, 269 n.8 (5th Cir. 2009).

employment any individual . . . because of the individual's . . . physical disability."
"Physically disabled," within the meaning of the statute, "refers to any individual who
has any chronic physical handicap, infirmity or impairment, whether congenital or
resulting from bodily injury . . ."  Conn. Gen. Stat. § 46a-51(15).  "Discriminatory claims
brought under the CFEPA are construed similarly to that of ADA claims, with the
Connecticut courts reviewing federal precedent concerning employment discrimination
for guidance in enforcing the CFEPA."  Worster v. Carlson Wagon Lit Travel, Inc., 353
F. Supp. 2d 257, 267 (D. Conn. 2005).  However, "CFEPA's definition of physical
disability is broader than the ADA's," because the CFEPA does not contain a
requirement that a plaintiff's impairment "substantially limit" that plaintiff's "major life
activities."  Beason v. United Technologies, 337 F.3d 271, 277-78 (2d Cir. 2003). As the
Second Circuit has held, "Connecticut and federal laws do not provide coextensive
disability discrimination coverage."  Id. at 278.

The Connecticut courts "review federal precedent concerning employment
discrimination for guidance in enforcing [Connecticut's] own anti-discrimination
statutes."  Levy v. Comm'n on Human Rights and Opportunities, 236 Conn. 96, 103
(1996).  The court will therefore apply the McDonnell-Douglas burden-shifting
framework, beginning with any analysis of whether Brown was "disabled" within the
meaning of the CFEPA.  See, e.g., Hall v. Family Care Home Visiting Nurse and Home
Care Agency, LLC, __ F. Supp. 2d __, 2010 WL 864513, at *6 (D. Conn. 2010).

1.      Whether Brown was "Physically Disabled"

Importantly, "Connecticut law does not provide a cause of action for perceived
physical disability discrimination."  Beason, 337 F.3d at 279.  Therefore, Brown must

12

establish a genuine issue of material fact as to whether he was actually disabled, in order to survive summary judgment on his CFEPA claim.[6]   Although the Memorandum in Opposition to the Motion for Summary Judgment is hardly clear on the matter, Brown's argument appears to be that the December 2005 injury to his back--and not his injuries prior to that date--constitutes his disability, for purposes of his CFEPA claim. Indeed, he readily admits that, prior to his back injury, his various physical impairments, including his shoulder injuries, "never stopped [him] from doing [his] job to the best of [his] ability."  Deposition of Kevin Brown at 40:21-23.  Moreover, he states that, in meetings with the defendants, his understanding was that "the defendants wanted the doctor to release [him] to go back to work with respect to [his] back injury."  Affidavit of Kevin Brown at ¶ 15.  No evidence has been provided to the court that Brown's back injury does not constitute a disability, for purposes of Conn. Gen. Stat. § § 46a-60(a)(1). Therefore, with regard to Brown's CFEPA claim, the court declines to grant summary judgment, on the ground that Brown was not physically disabled within the meaning of the statute.

---

[6]  Brown asserts that "defendant did not argue and assumed arguendo that plaintiff suffers an impairment," and that, "[a]s a result, plaintiff is disabled as that term is defined by CFEPA."  This statement is puzzling to the court.  First, it is not clear why Brown believes the defendants would seek to argue that Brown "suffers an impairment" in the first place.  Second, in their Memorandum in Support of the Motion for Summary Judgment, the defendants state that, "[t]o the extent applicable, the Defendants' facts and argument as appearing and submitted in this Memorandum to address Plaintiff's claims pursuant to the Americans with Disabilities Act constitute the facts and arguments to address the Plaintiff's claims pursuant to CFEPA."  Mem. in Supp. at 22.  In arguing that summary judgment should be granted as to Brown's ADA claim, the defendants make very clear that they believe Brown does not "suffer[] an impairment."  Mem. in Supp. at 5.

The court is also puzzled by the defendants' representation, made in the Motion for Summary Judgment, that Brown "f[a]iled to state a claim of relief pursuant to Section 46a-60."  See Motion at 1.  The defendants' Memorandum in Support does not argue that Brown "failed to state a claim," none of the filings related to the Motion for Summary Judgment reference Fed. R. Civ. P. 12(b)(6), and there was never any motion to dismiss filed in this matter.

2.      Whether Brown was "Otherwise Qualified"

The next question for the court is whether, given his back injury, Brown was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation.  See Curry v. Allan S. Goodman, Inc., 286 Conn. 390, 419-20 (2008) (discussing this element of a claim under section 46a-60).  Brown has provided evidence that, on April 2, 2007, roughly four months after the termination of his employment, his doctor informed the City that he "could do the job," with "some lifting restrictions."  Affidavit of Kevin Brown at ¶ 17.  The doctor's letter, which appears to have been signed by Dr. Matza, states that Brown would be restricted from lifting amounts in excess of 20 pounds, but that Brown would not be otherwise precluded from performing the "essential duties" of the job.  See Doctor's Note Dated April 2, 2007.

Prior to suffering his back injury, Brown was employed at Barnard School in Waterbury, in a capacity as "Maintainer II."  L.R. 56(a)(1) at ¶ 32.  During his shift, which lasted from 6:00 a.m. to 2:00 p.m. daily, Brown was the only custodial employee at the school.  Id. at ¶ 35.  Consequently, and as Brown admits, he was required to perform the duties not only of an employee in the role of Maintainer II, but also of an employee in the role of Maintainer I.  Id. at ¶ 38.  As the job description for Maintainer II makes clear, employees in the role of Maintainer II are "[r]equired to perform all duties of Maintainer I when required." Job Description for Maintainer II.

It appears to be undisputed that an essential function of Brown's position at Barnard School was to engage in "[r]outine heavy manual work, lifting, loading and unloading."  Job Description for Maintainer I at 2.  As Brown admits, an employee in his role is required to be able to lift "up to at least 100 pounds, to push and pull heavy

14

objects, to lift heavy objects above the shoulders and to repeatedly climb flights of stairs." L.R. 56(a)(1) at ¶ 43. For instance, Brown testified that he would have to empty 55-gallon trash barrels at least twice per day at Barnard school, and that each of these barrels weighed between 75 and 150 pounds. Id. at ¶ 45, 47.

Brown argues that he "has always struggled with physical injuries and despite this fact defendant employed him." Mem. in Opp. at 11. This fact, even if true, is beside the point. Brown has presented voluminous evidence that his injuries that occurred prior to 2005 did not affect his ability to fully perform his job. As stated above, Brown does not appear to be claiming that his shoulder injuries left him "disabled," as that term is used in CFEPA, because such a claim would sharply contradict his own deposition testimony. The court, therefore, must resolve the question of whether Brown was otherwise qualified to perform the essential functions of his position, given his back injury. The evidence plainly shows that, after his back injury, Brown would be precluded from lifting amounts in excess of 20 pounds. See Doctor's Note Dated April 2, 2007.

Clearly, as of April 2007, Dr. Matza believed Brown would be able to continue to work as a Maintainer, as long as he was able to avoid lifting weights of twenty pounds or more. But given the uncontroverted fact that an essential function of Brown's job was the ability to lift at least 100 pounds, which is five times the amount prescribed by his doctor, no reasonable jury could find that he could perform that essential function of his position.[7] The court therefore grants summary judgment to the defendants on

---

[7]There is, apparently, no issue in this case of whether Brown was denied a "reasonable accommodation." First, the Complaint never alleges that any reasonable accommodation was denied. Second, it is highly dubious that any reasonable accommodation could have been made--indeed, Brown never proposed a reasonable accommodation before or after his employment with the Board of Education was terminated, and, based on the documents submitted in this case, the court is not aware of what such

Brown's CFEPA claim.

    C.    <u>First Amendment Retaliation</u>

In Count Three, Brown claims that he was fired in retaliation for bringing the 2005 lawsuit, and that such retaliation violated his rights under the First Amendment to the United States Constitution.  "Under the First Amendment, 'a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' "  <u>Weintraub v. Board of Educ.</u>, 593 F.3d 196, 200 (2d Cir. 2010) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 142 (1983)).  However, a public employee's right to comment on "matters public interest . . . [is] not absolute, because the government, as an employer, has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services."  <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 382 (2d Cir. 2003) (citations and internal quotation marks omitted).  To establish a claim of retaliation in violation of the First Amendment, a plaintiff must first show that he spoke "as a citizen on a matter of public concern."  <u>Sousa v. Roque</u>, 578 F.3d 164, 170 (2d Cir. 2009) (internal quotation marks and citation omitted).  He must then show that he suffered an adverse employment action, and that the speech was "at least a substantial or motivating factor in the adverse employment action."  <u>Johnson v. Ganim</u>, 342 F.3d 105, 112 (2d Cir. 2003) (internal quotation marks and citation omitted).

There is no dispute that Brown suffered an adverse employment action when his employment was terminated by the Board of Education.  There is also apparently no

---

reasonable accommodations could possibly be.

16

dispute that Brown's allegedly protected speech was made "as a citizen."  Two issues,
therefore, remain for the court.  The court will first address whether Brown's speech
was "on a matter of public concern," and second, whether there is a "causal connection"
between Brown's allegedly protected speech and the subsequent termination of his
employment.

        1.     Matter of Public Concern

     "If the court determines that the plaintiff . . . did not speak on a matter of public
concern, the employee has no First Amendment cause of action based on his . . .
employer's reaction to the speech."  Sousa, 578 F.3d at 170.  The defendants argue
that the speech in which Brown engaged when he filed the 2005 lawsuit was not on a
matter of public concern, because "said lawsuit addressed only matters of personal
interest to . . . Brown such as were there particular facts pertinent to Mr. Brown's
situation to support the existence of probable cause for the arrest of Mr. Brown on or
about July 1, 2002."  Mem. in Supp. at 25.  The defendants repeatedly stress Brown's
motivation for bringing the 2005 lawsuit, noting that it was "based on personal motives,"
"sought damages of a personal nature," and that the Complaint was "void of any civic-
minded purposes or motives."  Id.

     While Brown's motivation for speaking is one factor that may be considered by
the court in determining whether his allegedly protected speech was on a "matter of
public concern," motive "is not dispositive" in the "matter of public concern" inquiry.
Sousa, 578 F.3d at 173.  Rather, a "matter of public concern" is one that "relat[es] to
any matter of political, social, or other concern to the community."  Connick, 461 U.S. at
146.  "Whether an employee's speech addresses a matter of public concern must be

17

determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48.  The court will therefore consider the content, form, and context of the 2005 lawsuit, as revealed by the record.

While Brown may have filed suit in the first place to obtain redress personally, the law is well-established that "[d]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern." Harman v. City of New York, 140 F.3d 111, 118 (2d Cir.1998) (internal quotation marks and citation omitted); see also Johnson v. Ganim, 342 F.3d at 113 ("Matters of public concern do include speech aimed at uncovering wrongdoing or breaches of public trust.") (internal quotation marks and citation omitted); id. ("[P]ublic corruption or wrongdoing" . . . is almost always a matter of public concern.") (internal quotation marks and citation omitted).  In the 2005 lawsuit, Brown alleged, inter alia, that Waterbury officials maliciously provided a prosecutor with false information to secure his arrest.  The content of Brown's speech, which relates to misconduct among public officials, clearly indicates that Brown was speaking on a "matter of public concern."

        2.    Causation

The defendants argue that there is no evidence of any causal connection between the 2005 lawsuit and the subsequent termination of Brown's employment.  In particular, the defendants stress the length of the 20-month span between the date on which Brown filed the lawsuit in April of 2005, and the date on which Brown's employment was terminated, which was December 7, 2006.  The defendants also maintain that, because Brown lost the 2005 lawsuit, and because the suit did not affect the City of Waterbury "in any negative manner whatsoever," the lawsuit provided no

incentive to the Board of Education to terminate Brown's employment.  Mem. in Supp. at 27.

The Second Circuit has held that a causal connection between an adverse employment action and protected speech "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."  Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).  "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  Id.  In this case, Brown argues that both the temporal proximity between his protected speech and the termination of his employment, and a statement made to him by Frost, would permit a reasonable jury to find that his protected speech caused his employment to be terminated.

"No bright line defines the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Cioffi v. Averill Park Central School Dist., 444 F.3d 158, 168 (2d Cir. 2006) (internal quotation marks and citation omitted).  However, the court agrees with Brown that the defendants wrongly emphasize the temporal relationship between the filing of the 2005 lawsuit and the termination of Brown's employment.  While Brown's employment was indeed terminated approximately 20 months after he filed the 2005 lawsuit, such termination occured less than three weeks after the suit ended, by way of a jury verdict in the

19

defendants' favor.  The court agrees with Brown that, based on the relatively brief

duration of the period between the end of the 2005 lawsuit and the termination of his

employment, a reasonable jury could find that the defendants intentionally waited to fire

him until the 2005 lawsuit was over.  Id. (holding that the passage of just over three

months was "sufficient to support an allegation of a causal connection strong enough to

survive summary judgment").

        Beyond temporal proximity, Brown has presented evidence that Frost made a

statement to him indicating that his release from work was in fact motivated by the 2005

lawsuit.  Brown's Affidavit alleges that, following a meeting with Frost, in which his

injuries and release from work were discussed, Frost stated that "[t]his is what happens

when you file a lawsuit against the city."  Affidavit of Kevin Brown at ¶ 16.  Especially

when coupled with the temporal proximity between the end of the 2005 lawsuit and the

termination of Brown's employment, this statement clearly gives rise to a disputed issue

of material fact as to whether Brown's termination was in retaliation for his protected

speech.[8]

        As the Second Circuit has stated, "[s]ummary judgment is precluded where

questions regarding an employer's motive predominate in the inquiry regarding how

important a role the protected speech played in the adverse employment decision."

Morris, 196 F.3d at 110.  In this case, based on the evidence Brown has presented,

there are disputed issues of material fact that bear on whether a causal connection

_____

        [8]  It further bears noting that the court is unpersuaded by the defendants' assertion that because
Brown lost the 2005 lawsuit, and because the suit did not affect the City of Waterbury negatively, the
lawsuit provided no incentive to the Board of Education to terminate Brown's employment.  The fact alone
that the Waterbury defendants prevailed on the merits does not reasonably lead to the conclusion that
those defendants suffered no reputational damage.

existed between Brown's protected speech and the adverse employment action he suffered.

### 3.      Summary[9]

The court has concluded that Brown's speech was on a matter of public concern and that a disputed issue of material fact exists as to whether there was a causal relationship between Brown's protected speech and the adverse employment action taken against him.  The court will therefore proceed to defendant Frost's qualified immunity defense.

### 4.      Qualified Immunity

In the alternative, defendant Frost[10] argues that summary judgment must be granted on Brown's First Amendment claim against him, under the doctrine of qualified immunity.  In an action under 42 U.S.C. § 1983, "[q]ualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007) (internal quotation marks

---

[9] Once a plaintiff shows that he spoke as a citizen on a matter of public concern, that he suffered an adverse employment action, and that a causal connection existed between the speech and the adverse employment action, "the government may avoid liability pursuant to either of two rationales.  The government may either (1) demonstrate by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech, or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression."  Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004).  The latter rationale, which is known as Pickering balancing, see Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), "represents a question of law for the court to decide."  Cobb, 363 F.3d at 102.
    In this case, the Memorandum in Support of the Motion for Summary Judgment does not argue that the defendants are entitled to summary judgment on Brown's First Amendment claim on Pickering balancing grounds.  Therefore, the court will not engage in a Pickering balancing analysis.

[10] To the extent a qualified immunity argument is set forth on behalf of the Board of Education, that argument is rejected.  It is well established that the defense of qualified immunity is inapplicable to municipalities and municipal corporations.  See Owen v. City of Independence, 445 U.S. 622, 657 (1980).

and citation omitted).  "To overcome the defense of qualified immunity, a plaintiff must show both (1) the violation of a constitutional right and (2) that that constitutional right was clearly established at the time of the alleged violation."  Huth v. Haslun, 598 F.3d 70, 73 (2d Cir. 2010) (citing Pearson v. Callahan, 129 S.Ct. 808, 816 (2009).  Construing the record in Brown's favor, Frost's actions violated his clearly established constitutional rights.

The Second Circuit has identified factors that courts must consider in determining whether a constitutional right was clearly established at the time the alleged constitutional violation occurred:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir.2005) (citations omitted).  In this case, a public employee's right not to suffer an adverse employment action in retaliation for engaging in protected speech was clearly established on December 7, 2006, the date on which the Board of Education terminated Brown's employment.  As the Second Circuit stated in 2001, "[f]or over 30 years the Supreme Court has consistently held that while the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech."  Locurto v. Safir, 264 F.3d 154, 166 (2d Cir. 2001) (collecting cases).  See also Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Bd. of Educ., 391 U.S. at 568.  Further,

22

as of December 7, 2006, the right of a public employee to speak as a citizen about "uncovering wrongdoing or breaches of public trust" was clearly established as a "matter of public concern."  Johnson, 342 F.3d at 113.

Qualified immunity is a question of law.  At the summary judgment stage, however, the facts of the case must be construed in Brown's favor, in determining whether Frost's actions violated his clearly established constitutional rights.  See Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007).  Brown has presented evidence that Frost told him that he was being fired for bringing a federal civil rights lawsuit.  Such firing took place less than three weeks after that lawsuit concluded.  Under Brown's version of the facts, Frost's conduct violates clearly established constitutional rights, of which a reasonable person would have known at the time.  Therefore, the court concludes that Frost is not entitled to qualified immunity on Brown's First Amendment retaliation claim.

## V.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Doc. No. 31) is **GRANTED IN PART** and **DENIED IN PART**.  It is granted as to the ADA claim contained in Count One of the Complaint, and as to the CFEPA claim contained in Count Two.  It is denied as to the First Amendment retaliation claim contained in Count Three.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 28th day of June, 2010.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge